# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISANA

| | |
|---|---|
| OHMSTEDE LTD., | CIVIL CASE NO. 17-cv-533 |
|       Plaintiff, | |
| | COMPLAINT |
| v. | |
| LEXINGTON INSURANCE COMPANY, | DEMAND FOR JURY TRIAL |
|       Defendant. | |

## COMPLAINT

Plaintiff Ohmstede Ltd. ("OHMSTEDE" or "Plaintiff"), an indirect, wholly-owned subsidiary of EMCOR Group, Inc. ("EMCOR"), by and through its undersigned counsel, hereby files suit against Defendant Lexington Insurance Company ("Defendant") and alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.       OHMSTEDE seeks to recover from Defendant all damages, penalties, fees, interest, and other relief to which it is legally entitled arising from Defendant's unjustified refusal to pay benefits owed under its commercial property policy with OHMSTEDE relating to a catastrophic flood which occurred on or about August 12, 2016 at OHMSTEDE's St. Gabriel manufacturing and industrial services plant located in Iberville Parish, Louisiana ("St. Gabriel Plant").

## THE PARTIES

2.    OHMSTEDE is a Texas limited company with a principal place of business in Beaumont, Texas.

3.    OHMSTEDE is an indirect, wholly-owned subsidiary of EMCOR Group, Inc.

4.    OHMSTEDE is a domestic manufacturer of shell and tube heat exchangers.  OHMSTEDE also performs field maintenance and repairs on shell and tube heat exchangers commonly found in petroleum and petrochemical plants. At all relevant times, OHMSTEDE maintained an office and operational manufacturing and industrial services plant in St. Gabriel, Louisiana.

5.    Defendant is a Delaware corporation with its principal place of business in Boston, Massachusetts.

6.    Upon information and belief, Defendant is a surplus lines carrier authorized to do, and doing business, in the State of Louisiana.

## JURISDICTION AND VENUE

7.    This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. section 1332(a) because Defendant is not a citizen of the same state as Plaintiff and the amount in controversy for each of the claims of loss and damage under the AIG Policy exceeds $75,000, exclusive of interest and costs.

8.     Venue in this judicial district is proper pursuant to 28 U.S.C. 1391(b) and (c) because Defendant issued an insurance policy to Plaintiff providing insurance coverage for the property in Iberville Parish, Louisiana that is the subject of this action.  Defendant is a corporation which is deemed to reside in any judicial district where its contacts would be sufficient to subject it to personal jurisdiction at the time the action is commenced.

## THE LEXINGTON POLICY

9.     Defendant issued an insurance policy to OHMSTEDE, bearing Policy No. 025031750 (the "Lexington Policy").  OHMSTEDE's copy of the Lexington Policy is attached to this complaint as Exhibit "A".

10.     The Lexington Policy was in effect from October 1, 2015 through October 1, 2016.

11.     The Lexington Policy has applicable Limits of $10,000,000 per occurrence, except said limits were increased to $125,000,000 for any one (1) occurrence for the peril of flood (but reduced to $25,000,000 at locations wholly or partially within Special Flood Hazard Areas (SFHA's)).

12.     OHMSTEDE is defined and referred to under the Lexington Policy as "THE INSURED".

13.     Pursuant to the terms of the Lexington Policy, Defendant agreed to timely and promptly pay/reimburse Plaintiff for "all risk of direct of physical loss

of or damage to property described herein…" which includes loss or damage resulting from a flood.

14.     The description of the property covered under the Lexington Policy includes:

"REAL AND PERSONAL PROPERTY INCLUDING CONTRACTOR'S EQUIPMENT; MACHINERY AND EQUIPMENT; BUILDER'S RISK/INSTALLATION FLOATER; IMPROVEMENTS & BETTERMENT'S; EDP HARDWARE, MEDIA AND DATA; INVENTORY; DIRECT BUSINESS INTERRUPTION FOR REAL AND PERSONAL PROPERTY, SOFT COSTS FOR INSTALLATION SITES AND EXTRA EXPENSE…" (See Exhibit "A".)

15.     In addition to providing coverage for real and personal property, including equipment, machinery, merchandise and inventory, and for direct business interruption, the Lexington Policy also provides coverage for: (i) extra expense incurred resulting from loss, damage, or destruction covered during the Policy Period to real or personal property as described above; (ii) service interruption from any electrical, steam, gas, water, sewer, telephone, or any other utility or service; (iii) demolition and increased cost of construction attributable to the enforcement of any law, ordinance, governmental directive or standard regulating the construction, repair, use, or occupancy of covered property; (iv) debris removal resulting from the cost of removal of debris of covered and uncovered property; (v) cost of cleanup made necessary as a result of covered physical loss or damage to property; (vi) expediting expense for the extra cost of

temporary repair and/or replacement and of expediting the same of covered damaged property, including overtime work; (vii) loss adjustment expenses incurred by the insured for preparing and certifying the details of a claim resulting from a covered loss; and (viii) consequential loss. (See Exhibit "A".)

16.    By endorsements 2 and 13, the Lexington Policy further provides coverage for loss or damage caused by or resulting from asbestos and/or mold/fungus which is a direct result of a covered peril (i.e., flood) not otherwise excluded under the Lexington Policy. (See Exhibit "A".)

## THE AUGUST 12, 2016 ST. GABRIEL PLANT FLOODING

17.    Beginning August 12, 2016 and lasting for approximately three days, when the Lexington Policy was in full force and effect, the St. Gabriel Plant was overcome by flood waters due to heavy rainstorms.  During the storms, over 20 inches of rain fell in less than 72 hours.  Rainfall rates peaked at six inches per hour.  Catastrophic flooding submerged thousands of homes and businesses.  The three days of record-breaking rain were described by U.S. Agency—The National Oceanic & Atmosphere Administration—as "historic", "exceedingly rare", and a "1 in 500 year event".

18.    In the aftermath (when the initial rains eased), the waters did not subside.  Instead, the water levels increased and remained at flood levels for more than three weeks.  The flooding interrupted the St. Gabriel Plant's manufacturing,

industrial services, and operations which resulted in significant business interruption loss and caused significant real and personal property damage, including without limitation, loss, damage and/or destruction of machinery, equipment, supplies, inventory and merchandise, as well as damage arising from and attendant to mold, fungus, asbestos and other hazardous materials.

19.    Although OHMSTEDE immediately began to mitigate the loss and damage, the environmental conditions at the St. Gabriel Plant and restrictions imposed by local and state governmental authorities delayed OHMSTEDE's access to the St. Gabriel Plant and ability to continue its mitigation efforts. The high water mark inside the St. Gabriel Plant would be measured at about 21 inches during this three-week period.

## INITIAL INVESTIGATION AND RESTORATION EFFORTS

20.    On August 13, 2016, Defendant began to adjust OHMSTEDE's claim under the terms and conditions of the Lexington Policy.

21.    On August 16, 2016 and August 18, 2016, Defendant conducted preliminary site inspections and met with representatives of OHMSTEDE to discuss the loss and damage caused by the flood.  It was apparent the St. Gabriel Plant had sustained severe physical and structural damage; machinery and equipment were destroyed; and utility and health and safety services were non-operational.

22.     Importantly, during these initial site inspections, Defendant acknowledged the extent of loss and damage that the St. Gabriel Plant would suffer if it missed the turnaround season.   Turnarounds are planned shutdowns of refineries.   During turnaround season, OHMSTEDE maintains, renovates, and upgrades refineries to ensure those refineries safely operate, stay competitive, and comply with governmental regulations. Accordingly, the St. Gabriel Plant's profits spike significantly during turnaround seasons.

23.     Throughout the remediation, cleanup and restoration process, OHMSTEDE relied upon and took direction and guidance from Defendant in order to restore the plant operations as quickly as possible.   Questions were raised by Defendant with respect to various aspects of the St. Gabriel Plant's operations which OHMSTEDE promptly answered.   Indeed, OHMSTEDE undertook the necessary tasks required by Defendant in the collection and assimilation of the information pertinent to assess the extent and scope of the property damage and economic loss. OHMSTEDE further coordinated, at the request of Defendant, a series of post-restoration inspections of the St. Gabriel Plant and the equipment and machinery affected by the flood.

24.     OHMSTEDE and Defendant met on several occasions to discuss ways to mitigate, document, and process the loss and damage.   OHMSTEDE undertook all reasonable means to mitigate damages and loss, and to maintain and make

available all business and other records, including but not limited to accounting, inventory, expense, supplies, rentals, machinery and equipment, and purchasing, all of which was provided to assist Defendant in its efforts to efficiently process the claim. OHMSTEDE has always complied and continues to comply with Defendant's requests for information and documentation in support of the claimed loss and damage.

## OHMSTEDE'S UNPAID CLAIM

25. Beginning in September 2016, OHMSTEDE and Defendant met to discuss the appropriate methodology for measuring the economic loss from business interruption at the St. Gabriel Plant.

26. Defendant proposed a sales-based methodology which would take into account actual and projected sales of the St. Gabriel Plant before, during and after the flood. OHMSTEDE rejected such approach and instead proposed a production-based methodology in order to more accurately measure the loss of income as it related to actual business activity unique to the St. Gabriel plan impacted by the flood. Importantly, unlike the sales-based approach proposed by Defendant, the production-based approach would allow for a more accurate measure of damages due to the seasonality of the business and turnaround activity unique to St. Gabriel's business operations.

27.   Under the production-based method, evaluation of (1) St. Gabriel Plant's actual production data and (2) industry production data was required. Specifically, the actual production component would be calculated based on net lost production hours; the extra expense incurred as a result of transferring jobs from the St. Gabriel Plant to other plants; and the credit margin generated on those transfer jobs.  The industry component would be calculated from and modeled against the production at OHMSTEDE's plant located in La Porte, Texas ("La Porte Plant") to determine the seasonality factor (i.e., the increase to base production average for the turnaround seasons) in the industry given the similarity of businesses, geographic location, and plant operations, including manufacturing, turnaround services, customers, and revenue generation.  The La Porte Plant was chosen because of the similarity of operations, geographic location, types of customers, labor costs, and market trends experienced by both operations.  The La Porte Plant would therefore provide the most realistic assessment of the projected lost production at the St. Gabriel Plant.

28.   Initially, Defendant agreed to the choice of the La Porte Plant.  As such, for several months, OHMSTEDE compiled data and prepared reports to evidence the business interruption loss based on the La Porte Plant comparison. However, after the calculations were performed for the business interruption loss, Defendant realized the amount of the claim and unreasonably, arbitrarily, and

capriciously withdrew from the agreement. Accordingly, Defendant, without any reasonable basis, disputed OHMSTEDE's claimed amount for business interruption as more fully described below.

29.     On November 22, 2016, OHMSTEDE and Defendant met to discuss the production-based methodology. Defendant agreed the production-based approach was the correct and most accurate measure of economic loss from business interruption. Subsequent meetings, telephone calls, and email correspondence between the parties during the months of December, January (including in-person meetings on January 10th, 22nd and 30th) and February 2017 (including a follow-up teleconference on February 28th) confirmed Defendant's agreement and, in particular, Defendant's approval of the La Porte Plant model.

30.     On February 10, 2017, pursuant to Defendant's request, OHMSTEDE began submitting interim claim reports consistent with the agreed-upon production-based methodology and calculation. As of this date, there was no dispute or objection communicated by Defendant as to the methodology, calculations, or the facts upon which the methodology and calculations were based.

31.     In March 2017, however, Defendant arbitrarily and capriciously changed its position with respect to the agreed-upon production-based methodology calculation. On March 10, 2017, Defendant sent a letter to OHMSTEDE advising for the first time it was no longer honoring its agreement to

utilize the La Porte Plant's production hours as a model against which the St. Gabriel business interruption loss would be derived. Defendant provided its own arbitrary and capricious calculations and valuation of the projected loss based on self-serving speculation and/or assumed facts, faulty assumptions and criteria, resulting in the significant and intentional undervaluation of the business interruption loss sustained by OHMSTEDE.

32.    As of the filing of this complaint, Defendant has refused to honor its original agreement with OHMSTEDE to reasonably measure and calculate the economic loss suffered by OHMSTEDE utilizing the production-based approach as set forth above. Despite having acknowledged back in August 2016 that the damage to the St. Gabriel Plant would cause it to miss the then imminent turnaround season, Defendant now refuses to attribute any value to the normal seasonality at the St. Gabriel Plant, La Porte Plant, or to the industry as a whole, or even consider the normal industry fourth quarter turnaround work increases and corresponding revenue increases.

33.    As of the date of the filing of this complaint, OHMSTEDE has submitted three separate reports to Defendant which comprise the business interruption claim: the first on February 10, 2017; the second on March 24, 2017; and the third on June 5, 2017, collectively covering the period of loss through April 30, 2017.

34.    As of March 31, 2017, OHMSTEDE's business interruption loss was calculated at over $3.8 million.  OHMSTEDE is preparing additional claim reports for the continued loss beyond April 30th in accordance and consistent with the production-based approach agreed to by the parties and under recognized insurance and/or accounting standards.   Despite OHMSTEDE's numerous reports and requests, Defendant arbitrarily refused to accept such reporting submitted by OHMSTEDE.

35.    For almost one year, Defendant was provided data and analysis prepared by OHMSTEDE, at its own expense, and compiled with Defendant's agreement and authority in order to substantiate the business interruption loss.  On August 7, 2017, Defendant advised OHMSTEDE it no longer accepted the business interruption loss analysis in its entirety and provided some of its alleged reasons.   Nevertheless, Defendant admitted its business interruption loss calculations resulted in OHMSTEDE being owed policy benefits.   However, Defendant did not offer to pay those undisputed amounts owed for the business interruption loss.

36.    The flooding not only forced OHMSTEDE to cease the St. Gabriel Plant's manufacturing and industrial services operations, resulting in significant business interruption, but it also caused significant real and personal property damage, including without limitation loss and destruction of machinery,

equipment, supplies, inventory and merchandise. OHMSTEDE has provided sufficient proof of claim for the property damage caused by the flood. Defendant has made some payments toward the property damage claim. However, Defendant has refused to pay and/or reimburse OHMSTEDE for all property damage owed.

37.    Plaintiff has performed all conditions, covenants and promises required to be performed in accordance with the terms and conditions of the Lexington Policy, except to the extent, if any, that Plaintiff was prevented by Defendant, or excused from such performance, or said conditions, covenants and promises have been waived, and are therefore entitled to all benefits of insurance provided by the Lexington Policy.

38.    Notwithstanding the terms and conditions of the Lexington Policy, the parties' agreement regarding the calculation and valuation of the claimed loss and for business interruption, and Plaintiff's compliance with the terms and conditions of the Lexington Policy, Defendant has arbitrarily and capriciously refused to pay any portion of OHMSTEDE's business interruption loss or the total amount of the property damage claim.

## COUNT 1

## (BREACH OF CONTRACT)

39.    Plaintiff repeats, realleges and incorporates by reference each every allegation contained in paragraphs 1 through 38 of this complaint.

40.    As set forth above, Plaintiff has a contract for insurance from Defendant that provides coverage without limitation for: business interruption; extra expense; extended indemnity; property damage; real and personal property, including without limitation: equipment, machinery, inventory and merchandise; extra expense incurred resulting from loss, damage, or destruction covered during the Policy Period to real or personal property as described above; service interruption from any electrical, steam, gas, water, sewer, telephone, or any other utility or service; demolition and increased cost of construction attributable to the enforcement of any law, ordinance, governmental directive or standard regulating the construction, repair, use, or occupancy of covered property; debris removal resulting from the cost of removal of debris of covered and uncovered property; cost of cleanup made necessary as a result of covered physical loss or damage to property; expediting expense for the extra cost of temporary repair and/or replacement and of expediting the same of covered damaged property, including overtime work; loss adjustment expenses incurred by the insured for preparing and certifying the details of a claim resulting from a covered loss; consequential loss; and loss or damage caused by or resulting from asbestos damaged and/or mold/fungus which is a direct result of a covered peril (i.e., flood) not otherwise excluded under the Lexington Policy.

41.    Plaintiff has performed all conditions, covenants and promises required to be performed in accordance with the terms and conditions of the Lexington Policy, except to the extent, if any, Plaintiff was prevented by Defendant, or excused from such performance, or said conditions, covenants and promises have been waived.

42.    Defendant agreed, and was legally and contractually required, to reasonably investigate the loss, provide a reasonable and timely coverage determination, and compensate Plaintiff for covered losses due to business interruption loss, extra expense, extended indemnity, property damage, and real and personal property loss all in an amount reflecting Plaintiff's true loss. Defendant was also required to conduct a reasonable, adequate and diligent investigation of any claims made by Plaintiff. Defendant has agreed that coverage is owed for Plaintiff's claimed loss and damage and that Plaintiff is entitled to such coverage under the Lexington Policy.

43.    Notwithstanding Defendant's promises and legal and contractual requirements, Defendant has refused to provide the amount of covered benefits owed under the Lexington Policy and has refused to pay the full amount owed to Plaintiff, or any amount as of the filing of this complaint. Defendant has further refused to pay undisputed amounts owed under the Lexington Policy for, among

other coverages owed, property damage, business interruption, extra expense and extended indemnity.

44.     In breach of the terms and conditions of Lexington Policy, Defendant, through its officers and/or agents, has refused and continues to refuse to pay Plaintiff for its claimed loss and damage arising from a covered cause of loss under the Lexington Policy.

45.     As a direct and proximate result of the breaches by Defendant, Plaintiff has and will continue to incur substantial loss and damage, as well as attorneys' fees and costs, experts' fees and costs, mitigation, investigation and other costs and expenses in excess of the jurisdictional limit of this court of $75,000, according to proof.

## COUNT 2

## (NEGLIGENCE – LA. CIV. CODE ART. 2315)

46.     Plaintiff repeats, realleges and incorporates by reference each every allegation contained in paragraphs 1 through 45 of this complaint.

47.     Defendant owes a duty of care to Plaintiff under the terms and conditions of the Lexington Policy and applicable Louisiana state and federal law.

48.     Defendant breached the duties owed to Plaintiff by failing to make just, adequate and timely payment on claims made by Plaintiff under the Lexington

Policy for the loss and damage Plaintiff sustained caused by a covered cause of loss under the Lexington Policy, including undisputed amounts owed.

49.    As a direct and proximate result of the breaches by Defendant, Plaintiff has and will continue to incur substantial loss and damage,, as well as attorneys' fees and costs, experts' fees and costs, mitigation, investigation and other costs and expenses in excess of the jurisdictional limit of this court of $75,000, according to proof.

## COUNT 3

## (UNFAIR TRADE PRACTICES – LA. REV. STAT. ANN. 51:1401 *et seq.*)

50.    Plaintiff repeats, realleges and incorporates by reference each every allegation contained in paragraphs 1 through 49 of this complaint.

51.    Plaintiff alleges and maintains Defendant's aforementioned conduct violated and continues to violate the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401 *et seq.* ("LUTPA").

52.    Plaintiff alleges Defendant's refusal and failure to pay the full amount of benefits owed to Plaintiff for its claimed loss and damage under the Lexington Policy constitutes bad faith in violation of LUTPA.

53.    Plaintiff alleges the unfair trade practices of Defendant include but are not limited to:

(i)     Failing to reasonably investigate and evaluate the coverages owed for Plaintiff's claims;

(ii)    Failing to reasonably adjust Plaintiff's claims in accordance with the terms and conditions of the Lexington Policy;

(iii)   Undervaluing Plaintiff's claims;

(iv)    Failing to pay the requisite amounts owed under the Lexington Policy;

(v)     Refusing to pay the undisputed amounts of the claim;

(vi)    Acknowledging the coverage obligations owed to Plaintiff but refusing to provide coverage to Plaintiff;

(vii)   Unreasonably delaying the resolution and payment of claims made by Plaintiff under the Lexington Policy after submission of the required proof of loss by Plaintiff;

(viii)  Unreasonably withholding monetary payment of policy benefits under the Lexington Policy to Plaintiff;

(ix)    Failing to provide Plaintiff with any reasonable or justifiable basis for withholding policy benefits from Plaintiff;

(x)     Breaching the terms and conditions of the Lexington Policy; and

(xi)    Violating LUTPA, including without limitation R.S. 22:1964.

54.    As a direct and proximate result of the unfair trade practices of Defendant, Plaintiff has and will continue to incur substantial loss and damage, as well as attorneys' fees and costs, experts' fees and costs, mitigation, investigation and other costs and expenses in excess of the jurisdictional limit of this court of $75,000, according to proof.

## COUNT 4

## (BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING / BAD FAITH – LA. REV. STAT. 22:1973)

55.    Plaintiff repeats, realleges and incorporates by reference each every allegation contained in paragraphs 1 through 54 of this complaint.

56.    La. R.S. 22:1973(A) provides: "An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach."

57.    La. R.S. 22:1973(B) provides: "Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:

19

(1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.

(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.

(6) Failing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause."

58.    Plaintiff alleges and maintains that Defendant's conduct, as set forth in this complaint, was and is a breach of Defendant's duty of good faith and fair dealing and its duty to "adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured."  In particular, Defendant:

(i)    Misrepresented pertinent facts and insurance policy provisions to OHMSTEDE;

(ii)    Failed to reasonably investigate and evaluate the coverages owed for Plaintiff's claims;

(iii)    Failed to reasonably adjust Plaintiff's claims in accordance with the terms and conditions of the Lexington Policy;

(iv)    Undervalued Plaintiff's claims;

(v)    Failed to timely pay the requisite amounts owed under the Lexington Policy;

(vi)   Failed to timely make an unconditional tender of the undisputed amounts owed under the Lexington Policy;

(vii)   Refused to pay the undisputed amounts of the claim;

(viii)   Acknowledged the coverage obligations owed to Plaintiff but refused to provide coverage to Plaintiff and/or failed to timely pay the undisputed amounts owed;

(ix)   Unreasonably delayed the resolution and payment of claims made by Plaintiff under the Lexington Policy after submission of the required proof of loss by Plaintiff;

(x)   Unreasonably withheld monetary payment of policy benefits under the Lexington Policy to Plaintiff; and

(xi)   Failed to provide Plaintiff with any reasonable or justifiable basis for withholding policy benefits from Plaintiff.

59.   As a direct and proximate result of the breaches by Defendant, Plaintiff has and will continue to incur substantial loss and damage, as well as attorneys' fees and costs, experts' fees and costs, mitigation, investigation and other costs and expenses in excess of the jurisdictional limit of this court of $75,000, according to proof.

60.   La. R.S. 22:1973(C) provides: "In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the

claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings."

61.    In addition to the claimed loss and damage as set forth above, Plaintiff seeks penalties pursuant to R.S. 22:1973(C) for Defendant's breaches as set forth herein.

## COUNT 5

## (BAD FAITH – LA. REV. STAT. 22:1892)

62.    Plaintiff repeats, realleges and incorporates by reference each every allegation contained in paragraphs 1 through 61 of this complaint.

63.    La. R.S. 22:1892(A)(1) provides: "All insurers issuing any type of contract, other than those specified in R.S. 22:1811, 1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest. The insurer shall notify the insurance producer of record of all such payments for property damage claims made in accordance with this Paragraph."

64.    La. R.S. 22:1892(A)(4) provides: "All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim."

65.    Plaintiff alleges and maintains it has submitted satisfactory proof of loss to Defendant for its claimed loss and damage under the Lexington Policy for which Defendant has failed to pay any amount within thirty (30) days as prescribed by La. R.S. 22:1892(A)(1) and (2).

66.    Plaintiff further alleges that Defendant failed to offer to settle Plaintiff's property damage claim within 30 days of Defendant's receipt of satisfactory proof of loss, in violation of La. R.S. 22:1892(A)(4).

67.    Plaintiff alleges and maintains Defendant's failures as herein alleged was and is unreasonable, capricious and arbitrary and constitutes bad faith.

68.    As a direct and proximate result of the failures by Defendant, Plaintiff has and will continue to incur substantial loss and damage, as well as attorneys' fees and costs, experts' fees and costs, mitigation, investigation and other costs and expenses in excess of the jurisdictional limit of this court of $75,000, according to proof.

69.    La. R.S. 22:1892(B)(1) provides: "Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim,

including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings."

70.    In addition to the claimed loss and damage as set forth above, Plaintiff hereby seeks penalties pursuant to R.S. 22:1892(B)(1) for Defendant's failures as set forth herein.

## COUNT 6

## (BAD FAITH BREACH OF CONTRACT – LA. CIV. CODE ART. 1997)

71.    Plaintiff repeats, realleges and incorporates by reference each every allegation contained in paragraphs 1 through 70 of this complaint.

72.    La. Civ. Code Art. 1997 provides: "An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform."

73.    Plaintiff alleges and maintains Defendant violated Art. 1997 by its acts and/or omissions as set forth in in this complaint.

74.    As a direct and proximate result of the acts and/or omissions by Defendant as herein alleged, Plaintiff has and will continue to incur substantial loss and damage, as well as attorneys' fees and costs, experts' fees and costs, mitigation, investigation and other costs and expenses in excess of the jurisdictional limit of this court of $75,000, according to proof.

75.    Defendant is liable for all of Plaintiff's damages, foreseeable or not, that are a direct consequence of Defendant's failure to perform.

## COUNT 7

## (BREACH OF FUDICIARY DUTIES)

76.    Plaintiff repeats, realleges and incorporates by reference each every allegation contained in paragraphs 1 through 75 of this complaint.

77.    Defendant owes Plaintiff "a high fiduciary duty to discharge its policy obligations to its insured in good faith."[1]

---

[1] *Kelly v. State Farm Fire & Cas. Co.*, 2014-1921 (La. 5/5/15, 20), 169 So.3d 328, 341.

78. Defendant breached the fiduciary duties it owed to Plaintiff by engaging in the conduct specified in Counts 1 through 6.

79. As a direct and proximate result of the breaches by Defendant, Plaintiff has and will continue to incur substantial loss and damage, as well as attorneys' fees and costs, experts' fees and costs, mitigation, investigation and other costs and expenses in excess of the jurisdictional limit of this court of $75,000, according to proof.

## COUNT 8

## (DECLARATORY JUDGMENT/RELIEF – 28 U.S.C. § 2201)

80. Plaintiff repeats, realleges and incorporates by reference each every allegation contained in paragraphs 1 through 79 of this complaint.

81. The Declaratory Judgment Act, 28 U.S.C. section 2201, allows a federal court to declare the rights and other legal obligations of any interested party seeking such declaration in an actual controversy within its jurisdiction.

82. Plaintiff seeks declaratory judgment pursuant to 28 U.S.C. section 2201 and Rule 57 of the Federal Rules of Civil Procedure to determine an actual substantial case or controversy which is real and immediate regarding Defendant's liability to Plaintiff for withholding and failing to pay policy benefits under the Lexington Policy.

83.    As set forth above, Defendant, among other things, promised to insure Plaintiff for any loss falling within the coverage defined in the Lexington Policy.

84.    As a result of Defendant's conduct, Plaintiff has and will continue to suffer a concrete and particularized injury to their business and real property as a result of the flooding at the St. Gabriel Plant.

85.    As a further result of Defendant's conduct, Plaintiff has and will continue to incur attorneys' fees and costs, experts' fees and costs, investigation costs, and other costs and expenses because of a loss falling within the coverage of, and/or as defined in, the Lexington Policy referred to hereinabove.

86.    Plaintiff provided timely notice of its claims to Defendant. Plaintiff has performed each covenant and/or condition which on its part must be performed in order to obtain the coverage referenced hereinabove, or has been excused from so performing as a result of Defendant's breach of the Lexington Policy, including refusal to pay Plaintiff for the business interruption loss and property damage it incurred caused by the flooding at the St. Gabriel Plant.

87.    A dispute has arisen between Plaintiff and Defendant, in that Plaintiff contends it is entitled to be paid for the amounts submitted to Defendant for loss and damage, including but not limited to, business interruption, extra expense, extended indemnity, property damage, restoration, and remediation, it sustained under the Lexington Policy as well as for all fees and costs incurred relating to the

claims submitted under the Lexington policy. Defendant unreasonably, arbitrarily, and capriciously takes the position that Plaintiff is not entitled to such sums.

88. An actual controversy exists between Plaintiff and Defendant regarding the scope of Defendant's duties under the Lexington Policy to pay Plaintiff for the loss and damage it incurred under the Lexington Policy.

89. As a direct and proximate result of the breaches described herein, Plaintiff has been damaged in an amount to be proven at time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.    For compensatory, general, and all consequential damages, according to proof;

2.    For the full amount of policy benefits owed to Plaintiff under the Lexington Policy for the loss and damage sustained by Plaintiff as a result of the flooding to the St. Gabriel Plant, which shall include loss and/or damage arising from the following: business interruption; extra expense; extended indemnity; property damage; real and personal property, including without limitation: equipment, machinery, inventory and merchandise; service interruption; demolition and increased cost of construction; debris removal of covered and uncovered property; cost of cleanup; expediting expense; loss

adjustment expenses; and loss or damage caused by or resulting from mold/fungus, restoration and remediation, and/or asbestos damaged;

3.    For statutory penalties pursuant to La. R.S. 22:1973(C) and 22:1892(B)(1);

4.    For declaratory judgment/relief;

5.    For attorneys' fees and costs;

6.    For experts' fees and costs;

7.    For mitigation, investigation and other costs and expenses;

8.    For legal interest, according to proof;

9.    For punitive damages, according to proof; and

10.    For all such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues triable to a jury.

RESPECTFULLY SUBMITTED:

 /s/ Todd Rossi
Todd A. Rossi (#11478) [Lead Attorney]
todd.rossi@keanmiller.com
Mark Mese (#14214)
mark.mese@keanmiller.com
Michael deBarros (#32422)
michael.debarros@keanmiller.com
KEAN MILLER LLP
400 Convention St., Suite 700
Baton Rouge, LA 70802
Telephone: 225-387-0999
Facsimile: 225-388-9133

**Counsel for Ohmstede Ltd.**